GEORGE KRAFT *vs.* LEWIS WICKEY.—*June,* 1832.

The Orphans Court of the county where letters of administration are granted, have power under the act of 1798, *ch.* 101, *sub-ch.* 12, to appoint a guardian to the infant children of an intestate, in all cases.

The legality and regularity of such an appointment, can in no manner be affected by the fact, that a guardian for such children had been appointed by the tribunals of another State.

Guardians like executors and administrators, can only sue in the courts of the country from which they derived their power. They have no extraterritorial authority, *qua* guardian.

The domestic guardian, having the property, is bound to pay for the maintenance and education of the ward. And the foreign guardian, having the custody of the ward, can enforce the fulfilment of this requisition by

an application to the proper tribunal. In such a case the domestic guardian would be regarded as a trustee. This results from the extent of the power granted to our courts, to appoint guardians, viz: in all cases where they grant administration, they may protect the rights of infants interested therein.

APPEAL from the Orphans Court of *Baltimore* county.

A petition was filed by the appellee, on the 5th of October, 1829, praying the Orphans Court of *Baltimore* county to revoke the appellant's appointment, as guardian to the infant children of one *Michael Marck*, deceased.

After the appellant had answered the petition, the following statement of facts was agreed on.

"It is admitted in this case, that *Michael Marck* made his last will and testament on the 13th July, 1820, which was duly proved, and recorded in the Orphans Court of *Baltimore* county, and that he died in the city of *Baltimore*, previously to the 16th of August, 1820, leaving a personal estate, consisting of money and leasehold property, situate in said city. That *Michael Kraft*, one of the executors in the will named, took out letters testamentary on said estate on the 19th August, 1820; the other executor named, having renounced the executorship, and that said *Michael Kraft*, settled his first, and final administration account, on the 5th of September, 1821, in which he obtained a credit for the personal estate, as delivered to *Philippina Marck*, the widow of the testator. That at the time of said *Marck's* death, his five children named in his will were living, to wit, *Dorothea, Henry, Michael, John,* and *George,* in the city of *Baltimore*, with their said mother *Philippina*. That said *Philippina* with her said children, about the year 1822, removed to the State of *Pennsylvania*, where she continued to reside up to the time of her death, which happened in June, 1829. That *Dorothea*, one of the children, died under the age of 14 years, before her said mother, in the State of *Pennsylvania*, and that the other children, namely, *Henry, Michael, John,* and *George,* have ever since the said removal of their mother, resided in the State of *Pennsylvania*, and yet reside there, and are all under

the age of twenty-one years. And also that the said *Philippina*, before her removal to the State of *Pennsylvania*, intermarried with the petitioner, *Lewis Wickey*, who resided with her in the said State, and has ever since continued to reside there. And that the said *Wickey* was appointed guardian of *Henry*, *Michael*, *John*, and *George*, children as aforesaid, by the Orphans Court for the county of *York*, in the State of *Pennsylvania:* and that on the 17th of August, 1829, the respondent *George Kraft*, applied to the Orphans Court of *Baltimore* county, and was appointed guardian of said children, by the said court of *Baltimore*, who were uninformed of the previous appointment, and duly entered into bond with surety approved of by the court, for the performance of his duty, as guardian aforesaid."

It appeared, by the certificate of the clerk of the Orphans Court in *Pennsylvania*, that the appellee was not required to give security for the performance of the trust confided to him by that court.

The Orphans Court decreed, that the guardianship of the person, and estate, of the said *Henry*, *Michael*, *John*, and *George Marck*, granted by this court to the said *George Kraft*, on the 17th of August, 1829, be, and the same is hereby revoked, inasmuch as the said *Henry*, *Michael*, *John*, and *George Marck*, had a guardian living at that time, who was regularly appointed in *York* county, State of *Pennsylvania*, where both the guardian, and the said minors resided, at the time of such appointment.

From this decree the appellant appealed to this court.

The cause was submitted on notes to EARLE, MARTIN, STEPHEN, ARCHER, and DORSEY, J.

*Mayer*, for the appellant.

The question in this cause is, whether a guardian appointed in another State, is authorised by virtue exclusively of such appointment, to act as guardian in this State in respect of property lying here, and under control of our Orphans Courts? The wards in this case lived, at the time of the

guardian's appointment in *Pennsylvania*, the State where he was appointed, and continued to live there when the present cause was instituted in the Orphans Court of *Baltimore* county. Our testamentary system, 1798, *ch.* 101, *sub-ch.* 12, uses terms so general, as necessarily to comprehend the case of wards abroad within the exclusive cognizance and appointing power, as to guardianship, of the Orphans Court, as concerns all property, the *administration of which* has been taken by such Orphans Court. The property in question in this cause, was administered upon under letters from the Orphans Court of *Baltimore* county. It is true, that the clause of the testamentary system referred to, uses permissive terms : *"shall have power to appoint"* guardians; but that phrase is equivalent to *"may* appoint"—and this latter has been construed as *imperative* language when used in any statute. Bond and security under our original testamentary system as to guardians, was not required, as of course to be given (see *sub-ch.* 12, *sec.* 3,) by any guardian appointed by will, or any natural guardians, such guardians are however, now required by subsequent act to give bond before they can act; and that was *always* the case with guardians appointed by the court. (4 *sec.*) In the case before the court, the guardian *had not even given bond in Pennsylvania*, as the record shows.

Although the law of the domicil of a decedent is allowed to regulate the distribution of his personal estate, as concerns the question, who are the persons to be the distributees ; yet that *estate* is under the protection and cognizance of the forum of the *lex rei sitæ*, and subject to the local regulations as regards the administration and care of it in reference to creditors, and to *all ultimately* entitled to it. The jurisdiction of the local tribunals *once having attached* by administration, as in this case, cannot, for the purposes of protection be considered as terminated, until the property be finally delivered to some *sui juris* proprietor. The subjection of all personal, as well as real estate, to the care of the local legislation and local tribunals,

is the foundation of the asserted control over it for creditors, and for all others concerned who are not of *themselves* enabled to take and dispose of it. This power of the local jurisdiction seems to be sanctioned by the decision in 5 *Peters' S. C. Rep.* 518.

The exclusiveness of the *local jurisdiction* is the ground of our principle, that a foreign administrator has no rights over personality in our State; and chancellor *Kent* has considered the case of a foreign guardian, as standing on the same reason—for he has decided 1 (*John. Ch. R.* 153.) that a guardian appointed in another State, has no power whatsoever in the State where the property lies, or the claim of his ward is to be asserted. In that decision our view is clearly and absolutely sustained; and we rely on it and the cases which are cited there, to show that the Orphans Court here erred. These cases and the general views we have taken, we think, would demonstrate the incorrectness of the court's opinion below; but our act of Assembly referred to, seems to fix the law in our favor, in terms too strict and unequivocal to allow any doubt.

The very existing necessity of applying to the court for the payment of the money to another, instead of the infant, namely, the foreign guardian, while it shows the necessity of a *judicial act* in the matter, also shows the continuing jurisdiction of the court, and its possession of the fund:— and by what rule is the court to govern itself in judging its *power to part with the fund,* unless it be that which the testamentary act lays down, that act being the exclusive charter of the court's powers? The case then in effect resolves itself into a question of Orphans Court *jurisdiction;* as it must be allowed that the question of power to part with the fund, subjected to jurisdiction, is as much a point of jurisdiction as the power to take possession of a fund. There is a reason, too, why the control of the Orphans Court, *as regulated by our local law,* should be prolonged over a fund, where no *positive statute intervenes,* even after the administration *for the benefit of the creditors,* has os-

tensibly been closed. It is, that notwithstanding the close of an administration, and although the residuum has been paid over to the distributee's guardian, a creditor may nevertheless affect that residuum in equity, and oblige the holder to refund, where the creditor happens to have omitted to present his claim within the legal term to the administrator. Where there is an *adult distributee*, the *statute*, positively, and *in terms*, requires the payment over—and there consequently, is an *express* termination put to the court's interference with the fund. Here, however, in case of minors, the right of the court to part with this fund, in this mode, to a foreign guardian, is attempted to be conferred on it merely by *construction*. Constructive powers are explicitly prohibited to be assumed by the Orphans Courts. (1798, *ch*. 101, *sub-ch*. 15, *sec*. 20.) But I do not merely rely on the constructive character of the authority now sought to be allowed to the Orphans Court—but my present view is further to show, that even looking at our law concerning creditors as regards a personal estate, and the policy of our jurisprudence on that subject. The personal property is not *necessarily* supposed to pass from the local jurisdiction and *local legislation,* so soon as the administrator closes his account with the Orphans Court; and that, in fact, some *local legislation* must *be shown* to *take away* the fund from our local courts at that particular period. We show that in the case of adults; and our *statute* provides for the case of minors, and the property can leave the control of the Orphans Court only in this way, and subject to the conditions which our statute law may prescribe; our Orphans Court being the limited creatures of statute. Our statute must therefore be referred to, to learn, who are the guardians to be recognized by the Orphans Court. They are only such as the Orphans Court appoints.

*Frick,* for the appellee.

In this case it is contended for the appellee, that the Orphans Court of *Baltimore* county acted correctly in revoking the appintment of appellant, as guardian for the rea-

sons stated in their decree; and *that* decree is consistent with the meaning and policy of our testamentary system.

It is denied by the appellee, that the terms of the act of 1798, *ch.* 101, *sub-ch.* 12, are in words so general, as *necessarily* to comprehend the case of wards abroad—for, in the 2d *sec. of the sub-ch.* power is given "to call or have brought before them, any orphans, *as aforesaid,* for the purpose of appointing a guardian;" and this section certainly cannot contemplate to carry this power into another State.

The whole of this sub-chapter hath reference to the custody of the infant's *person,* with reference to his maintenance and education out of his property; and is part of that curative system which every State, as *parens patriæ,* exercises over its minors and orphans.    That duty in this case is incumbent on the State of *Pennsylvania,* not upon us. On the application of the infants and widow, the appellee has been rightfully constituted guardian of their *persons and estates,* by and in *Pennsylvania,* where, it is not an overstrained presumption to suppose, their interests and the bulk of their property are concentrated.

But, conceding that there is property in this State, (although it appears by the record, that the whole of the testator's estate was delivered to the widow, and that she removed to, and died in another State;) and that the court ought to have sustained the claims of the appellant; conceding this, would not his appointment here confer upon him the custody of the infant wards, requiring him to bring them into this State, and thus invite a conflict of jurisdiction with the tribunals of another State, who have delegated that parental authority to the appellee?    What is the possession of the property unaccompanied with the *custody of the ward?*    Can such a thing have been in the contemplation of the framers of our testamentary acts?    Much less the idea of two conflicting claimants contesting, under the authority of independent courts, the right to the possession of the ward.    Who, of the two guardians, is responsible for the

leading intent of the law, the maintainance and education of the ward? *Is it not agnum committere lupis?*

It cannot therefore be, that the act of Assembly referred to, ever contemplated to separate the possession of the infant's property from the custody of the infant—and the reasoning, from the rule laid down in the case cited by appellant, (1 *Johns. Chancery*, 156) "that letters testamentary give no authority abroad," does not apply; because administration has particular reference to the collection and custody of the *property alone*; and is unlike, in this respect, to guardianship, that takes up that property, *together with, and inseparable from the custody of the infant,* when the functions of the administrator have ceased.

2dly. Are the Orphan's Court bound to appoint? Are the words of the act imperative to appoint upon any application, whether a case is, or is not, made out to justify the interference of the court? Such a case as brings the infant within the limits and under the protection of the State, which is one essential; and having property within the State, which is the other essential? Even in such a case, an infant hath the right reserved at a certain age to name a guardian, (*see* 1715, *ch.* 39, *sec.* 7,) while it appears that the appointment of the appellant, in this case, was without the concurrence or knowledge of the infants, *being of sufficient age,* and under a mistaken assumption of the court, that the infants resided in this State, and had no legally constituted guardian. The power is certainly so far discretionary, that they are to judge of the case presented to them; and having acted without all the facts of this case before them, they had a right, and they did right, on a full presentation of the case, to revoke the appointment in question. " The Orphans Courts are tribunals confessedly limited in their jurisdiction, unable to exercise any authority whatsoever, not expressly given by law;" and it is a question whether the testamentary laws of this State give to them, or can give to them authority to appoint guardians for the custody of infants, who are not within the limits or the juris-

diction of the State, and who cannot be made subject to the control of such guardian, or the powers of the court as contemplated by the second section of sub-chapter 12, of the act of 1799;—and, even if given, it must be viewed as a discretionary power, which they have exercised with sound judgment in its application to this particular case.

ARCHER, J., delivered the opinion of the court.

Administration on the estate of *Michael Marck* having been granted in *Baltimore* county, the Orphans Court of that county had express power conferred upon it to appoint a guardian to his infant children, and the legality, and consequent regularity of this appointment could, in no manner, be affected by the fact, that a guardian for these children had been appointed by the Orphans Court of *York* county, in the State of *Pennsylvania*. For the appointment of a guardian granted in a foreign State can have no extra-territorial operation, so as to oust our courts of their jurisdiction over the property of infants.

This appears long to have been the doctrine in *England*, with regard to executors and administrators, who, deriving their powers from foreign tribunals, had not only no power to supersede those appointed to the administration of the estate by the domestic forum, but had not even the power to sue for and recover rights and credits of their testator or intestate.

*Chancellor Kent,* in 1 *Johns. Ch. Rep.* 156, refused to decree payment of a legacy to a guardian appointed by the courts of *Pennsylvania,* and declared the necessity of an appointment of a guardian in *New York,* before the legacy could be paid, and expressed his opinion, that the same rule should govern the case of guardians, as was applicable to executors and administrators.

It is said in *Tourtor vs. Thower,* 3 *P. Wms.* 369, that our courts take no notice of what is done in the Spiritual Courts beyond sea. If it be true, that foreign guardians could not,

*qua* such, sue in our courts, (and that persons coming in
*en autre droit*, under the appointment of foreign laws, can-
not sue, would seem to be settled. 4 *Cowen* 529, *note.*)
to consider, under such circumstances, the foreign guardian
the only person who could rightfully administer his ward's
property, would be to render such foreign guardian utterly
powerless to perform his trusts. For, although the only
legal guardian, he could recover nothing.

It seems to us, that the legislature has placed all the per-
sonal property of the wards within the limits of the juris-
diction of the Orphans Court granting letters, under the
peculiar protection of our laws. It is to be managed and
governed by them, and protected by all those rules which
have been so carefully prescribed for its preservation. To
give a sanction to the foreign appointment of a guardian, in
its consequences, would subject it to different rules and
regulations never anticipated by the legislature.

Thus our law imperatively requires, that every guardian
appointed by the court should give bond with security;
whereas, should the guardian in *Pennsylvania* be entitled,
he has given no security.

But it is supposed, that the determination which would
give validity to the guardian's appointment, made by our
courts, when, at the same time there existed a guardian ap-
pointed by a foreign power, would produce a conflict of
jurisdictions prejudicial to the interests of the minor. But
it cannot be perceived in what manner this result is to be
produced. The control of the person of the ward being
with the foreign jurisdiction, cannot be disturbed by the
guardian here; on the other hand, the foreign guardian
cannot interfere with the management and control, by the
domestic guardian, of the ward's property. It is true, the
domestic guardian is bound to pay for the maintenance and
education of the ward, and the foreign guardian can always
enforce the fulfilment of this requisition by an application
to the proper tribunal. The obligation of the domestic
guardian, it is scarcely necessary to say, to pay for the

maintenance and education of the ward, out of the property under his control, is precisely the same whether the ward reside here, or within a foreign jurisdiction. It is true, that in all cases of wards within our jurisdiction, the guardian acts both the part of a *tutor* and *curator*, and as such takes custody of the person and property of his ward. But, as the act of 1798 contemplated a guardianship in all cases where the property was administered upon here, there may be cases in which the guardian would only act as a trustee of the property; applying it, to be sure, for the support of the infant, without however his having the immediate care and custody of his person. And the case before us appears to be one of that description.

DECREE REVERSED.